```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
WILLIAM RAMOS,                          : 06 Civ. 3886 (GBD) (JCF)
                                        :
                Petitioner,             :        REPORT AND
                                        :        RECOMMENDATION
        - against -                     :
                                        :
THE PEOPLE OF THE STATE OF              :
NEW YORK,                               :
                Respondent.             :
- - - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:
```

William Ramos brings this petition pursuant to 28 U.S.C. §
2254, challenging his conviction for first degree robbery following
a jury trial in New York State Supreme Court, Bronx County.  Mr.
Ramos contends that (1) the prosecutor committed misconduct during
her summation by making remarks not supported by the evidence; (2)
trial counsel was ineffective for failing to object to the
prosecutor's remarks; (3) a recording of the complaining witness's
911 call was improperly admitted into evidence; (4) his ten year
sentence was excessive and the procedure according to which he was
sentenced was unconstitutional; and (5) the evidence presented at
trial did not support the conviction.  For the reasons that follow,
I recommend that the petition be denied.

Background

    A. Trial

    At trial, the complaining witness, Empress Djata, testified

that she met Mr. Ramos and his co-defendant, Natasha Veeraswamy,[1] when they responded to an advertisement that she placed in the Village Voice seeking performers for "showcases" designed to give exposure to unsigned performing artists.  (1st Tr. at 246, 248).[2] Mr. Ramos, a disc jockey, was serving as Ms. Veeraswamy's manager. (1st Tr. at 246, 250, 257).  On August 19, 2000, Mr. Ramos and Ms. Veeraswamy met with Ms. Djata and gave her photographs and "bios." (1st Tr. at 247-50).  Ms. Veeraswamy also filled out and signed various agreements related to the showcases.  (1st Tr. at 249-54).

In September 2000, Ms. Veeraswamy performed during one of Ms. Djata's showcases as a background dancer for a singer named Bugsy, who was also managed by Mr. Ramos.  (1st Tr. at 250, 258).  This showcase was recorded on video and Ms. Djata told Mr. Ramos that he could have a copy of the recording.  (1st Tr. at 260-61).  However, Ms. Djata was unable to use a friend's studio to edit the recording because he was busy and often out of town.  (1st Tr. at 261).  Mr. Ramos called Ms. Djata several times to ask for a copy of the recording, but she explained that she was unable to make him a copy

---

[1] Throughout the record, Mr. Ramos's co-defendant's name is spelled "Veerasawmy."  However, it is spelled "Veeraswamy" in the Appellate Division's decision on her appeal, People v. Veeraswamy, 11 A.D.3d 345, 784 N.Y.S.2d 488 (1st Dep't 2004), and I have used that spelling here.

[2] The trial took place from September 3, 2002 to September 11, 2002.  There is a pagination break in the transcript, with the page numbers starting over from "1" on September 9, 2002.  Accordingly, "1st Tr." refers to the first part of the trial transcript and "2nd Tr." refers to the second part.

until her friend returned.  (1st Tr. at 262).

Ms. Djata testified that on January 21, 2001, Mr. Ramos and Ms. Veeraswamy came to Ms. Djata's apartment and forced their way in.  (1st Tr. at 262, 264-66).  According to the testimony of both Ms. Djata and her roommate at the time, Evelyn Burgos, Mr. Ramos brandished a gun and demanded the videotape.[3]  (1st Tr. at 265-67, 360).  He also demanded the folder containing the bios, photographs, and signed agreements.  (1st Tr. at 268).  At one point, Ms. Veeraswamy ran into the bedroom, grabbed Ms. Djata's video camera and ran out of the apartment.  (1st Tr. at 269, 362).  Ms. Djata testified that when she came back in, Mr. Ramos told her to turn up the radio because he was going to shoot Ms. Djata in the foot.  (1st Tr. at 269, 363).  However, Ms. Veeraswamy could not figure out how to use Ms. Djata's radio, and the assailants left. (1st Tr. at 363-64).

After the defendants left her apartment, Ms. Djata called 911. (1st Tr. at 269-70, 364).  A recording of the call was admitted into evidence under the "excited utterance" exception to the hearsay rule.  (1st Tr. at 272-73, 276, 286-90).  The recording, which was approximately ten minutes long, contained Ms. Djata's conversation with the 911 operator.  (Tr. at 280-81).  Ms. Djata

---

[3] Mr. Ramos insists that the videotape that he wanted was not the one made by Ms. Djata's friend, but rather a recording made by his friend Michael Rapley. (Petitioner's Reply and Memorandum of Law ("Pet. Reply") at 5).  This distinction, however, is not relevant to the petitioner's claims.

could be heard on the recording asking Ms. Burgos to get her "files" on Mr. Ramos and Ms. Veeraswamy and commenting that it was "stupid" of the defendants to have robbed her because she had their photographs and biographical information. (1st Tr. at 281). Ms. Djata was put on hold several times during the call, apparently while the operator communicated with the police, during which time she could be heard continuing to speak with Ms. Burgos. (1st Tr. at 273). Ms. Djata testified that the police came to the apartment after she called 911, and that after they left, Mr. Ramos called her and told her that he would return her video camera. (1st Tr. at 310-12).

By contrast, Ms. Veeraswamy testified that on the night in question she went to Ms. Djata's apartment alone without a weapon. (2nd Tr. at 21-22). She testified that she wanted the photographs she had given to Ms. Djata, and that Ms. Djata did not have them ready for her. (2nd Tr. at 21-22). According to Ms. Veeraswamy, she took the video camera "more or less to aggravate [Ms. Djata] a little bit" because she would not return the photographs. (2nd Tr. at 22). She then went to Mr. Ramos's house and told him that she had taken the camera. (2nd Tr. at 23). Ms. Veeraswamy testified that after she arrived at his apartment, Mr. Ramos called Ms. Djata. (2nd Tr. at 23). She also testified that she taped his conversation with Ms. Djata using Ms. Djata's video camera. (2nd Tr. at 23-24).

Ms. Djata testified that several days later, she received another telephone call from Mr. Ramos, who told her that the video camera was outside her door.  (1st Tr. at 327).  After Ms. Djata retrieved the camera, she discovered that a portion of the tape that was in it had been recorded over.  (1st Tr. at 313).  That portion of the tape now showed Mr. Ramos speaking to Ms. Djata on the telephone on the night that the video camera was taken.  (1st Tr. at 316).  The videotape was admitted into evidence and played for the jury.  (1st Tr. at 315-16).  During her summation, the prosecutor again played the portion of the videotape that showed Mr. Ramos speaking to Ms. Djata on the telephone.  (2nd Tr. at 110-11).  She paused the tape, asked the jury to look at it closely, and indicated that an object shown on the videotape was the gun used in the robbery:

> I'm going to ask you to look right here.  I submit to you right there is the gun that was used.  That's the Lone Ranger gun.  You can see it from the back, you can see it set up on that television or box or shelf o[r] whatever it is that it's sitting on. . . .  I ask you to continue to look at it and form your opinions as to what it is.  Like the Lone Ranger gun, it has a round cylinder where the bullets go in and if you observe you can see dark spots on that round section.[4]

(2nd Tr. at 110-11).

_____

[4] Although the transcript of the 911 call is not part of the record, it appears that Ms. Djata described the gun during the call as being like a gun "out of the Lone Ranger."  (Brief for Defendant-Appellant ("Pet. App. Brief"), attached as Exh. 1 to Affidavit of Dimitri Maisonet dated Dec. 14, 2006 ("Maisonet Aff.")).

The jury convicted Mr. Ramos of first degree robbery and Ms. Veeraswamy of second degree robbery. (2nd Tr. at 208, 210). Mr. Ramos was adjudicated a second felony offender and sentenced to twelve years in prison followed by five years of supervised release. (S. at 3-5, 13-14).[5]

B. Subsequent Proceedings

The petitioner, through counsel, appealed his conviction and sentence on five grounds, contending that (1) the evidence presented did not establish his guilt beyond a reasonable doubt; (2) the trial court improperly admitted in evidence the tape of the Ms. Djata's 911 call; (3) the prosecutor engaged in misconduct by making comments in summation that were not supported by the evidence; (4) the petitioner's attorney was ineffective because he failed to object to the prosecutor's misconduct; and (5) Mr. Ramos's sentence was excessive. (Pet. App. Brief). Mr. Ramos also sought leave to file a separate pro se appellate brief contending, among other things, that the videotape introduced by the prosecution at trial was not disclosed in advance as required by Brady v. Maryland, 373 U.S. 83 (1963). (Affidavit in Support, attached as Exh. 3 to Maisonet Aff., ¶ 5(a)). The Appellate Division, First Department denied the petitioner leave to file a pro se brief and affirmed his conviction while reducing his

---

[5] "S." refers to the transcript of sentencing proceedings held on September 26, 2001.

sentence to ten years in the interest of justice.  <u>People v. Ramos</u>,
12 A.D.3d 316, 316-17, 786 N.Y.S.2d 424, 424-25  (1st Dep't 2004).
The New York Court of Appeals subsequently denied the petitioner's
application for leave to appeal.  <u>People v. Ramos</u>, 4 N.Y.3d 767,
792 N.Y.S.2d 10 (2005).

In February 2006, Mr. Ramos executed a habeas corpus
petition.[6]  The petition included four of the five claims that Mr.
Ramos had raised on appeal: sufficiency of the evidence,
admissibility of the 911 tape, prosecutorial misconduct, and
ineffective assistance of trial counsel.  It also raised two
additional claims of ineffective assistance of appellate counsel.
Specifically, Mr. Ramos contended that on appeal his attorney
should have argued (1) the prosecutor's failure to disclose the
videotape in advance was a <u>Brady</u> violation, and (2) that the
evidence supported a "claim of right" defense to robbery.  Mr.
Ramos then moved to amend the petition by (1) expanding upon the
prosecutorial misconduct and ineffective assistance of trial
counsel claims and (2) asserting the excessive sentence claim that
he had raised on direct appeal.  He also moved to stay further
proceedings until he had exhausted state remedies with respect to
his ineffective assistance of appellate counsel claims.

In an order dated October 12, 2006, I denied the petitioner's

_____

[6] The petition was originally filed with the United States
District Court for the Northern District of New York but was
transferred to this Court on April 21, 2006.

motion for a stay and granted his motion to amend the petition. Mr. Ramos filed an amended petition on October 23, 2006.  The amended petition contains the four claims raised in the initial petition.  In addition, Mr. Ramos now contends that the prosecutor's allegedly improper comments in summation were themselves a <u>Brady</u> violation.  He also alleges that his ten year sentence is excessive and, further, that it is impermissible under <u>United States v. Booker</u>, 543 U.S. 220 (2005).

<u>Discussion</u>[7]

A. Prosecutorial Misconduct and Ineffective Assistance of
   Trial Counsel

   1. <u>Procedural Bar</u>

---

[7] Prior to passage of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), factual findings made by a state court after an evidentiary hearing were presumed correct in a federal habeas proceeding, but federal courts were not required to defer to state court determinations of law and of mixed questions of law and fact.  <u>See</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 107-12 (1995); <u>Brown v. Artuz</u>, 283 F.3d 492, 497 (2d Cir. 2002).  Under the AEDPA, however, a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The AEDPA standard applies to this case since Mr. Ramos filed his petition after the Act's effective date.  <u>See</u> <u>Brown</u>, 283 F.3d at 498 n.2.  Nevertheless, since each of the petitioner's claims fails under the less deferential pre-AEDPA standard, there is no need to conduct the AEDPA's more intricate analysis.  <u>Cf.</u> <u>Kruelski v. Connecticut Superior Court for the Judicial District of Danbury</u>, 316 F.3d 103, 106 (2d Cir. 2003) (suggesting, in post-AEDPA cases, that habeas courts assess first whether state court's ruling was erroneous under "correct interpretation" of the federal law at issue, then whether the ruling was unreasonable).

Mr. Ramos contends, as he did on appeal, that he was denied due process when the prosecutor argued in her summation that an object seen on the videotape was the gun used in the robbery. Mr. Ramos claims that these statements made the prosecutor "an un-sworn witness" because there was no testimony linking the object seen in the videotape to the gun used during the robbery. (Pet. App. Brief at 34-38; Pet. Reply at 6-a). The Appellate Division found that this claim was unpreserved and declined to review it in the interest of justice. Ramos, 12 A.D.3d at 317, 786 N.Y.S.2d at 425. The court went on to state that if it were to review the claim, it "would find that the challenged comment asked the jury to draw a reasonable inference from the evidence." Id. at 317, 790 N.Y.S.2d at 425.

Federal habeas review is prohibited if a state court rests its judgment on a state law ground that is independent of the federal question and adequate to support the judgment. Cotto v. Herbert, 331 F.3d 217, 238 (2d Cir. 2003). Such an independent and adequate state ground will be found where "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." Levine v. Commissioner of Correctional Services, 44 F.3d 121, 126 (2d Cir. 1995) (internal quotation marks and citation omitted). Under New York's contemporaneous objection rule, an issue is properly preserved for appeal only if the appellant objected on that ground during the

trial below.  Glenn v. Bartlett, 98 F.3d 721, 724 n.2 (2d Cir. 1996) (citing People v. Cona, 49 N.Y.2d 26, 33-34, 424 N.Y.S.2d 146, 148-49 (1979)); see also N.Y. Criminal Procedure Law § 470.05(2).  A violation of the contemporaneous objection rule is an adequate procedural bar to federal habeas review.  Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999).  Accordingly, Mr. Ramos' due process claim regarding the prosecutor's comments is procedurally barred because the state court declined to review it on the ground that the argument was not preserved for appeal.  See Rodriguez v. Schriver, 392 F.3d 505, 510-11 (2d Cir. 2004); Garcia, 188 F.3d at 78; Glenn, 98 F.3d at 724-25; Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir. 1994).  The Appellate Division's subsequent statement that if the court were to review the claim it would find that the comments were proper does not render the petitioner's claim reviewable in a habeas corpus proceeding.  "[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."  Glenn, 98 F.3d at 724 (quoting Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990)); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.").

A petitioner can overcome a procedural bar and obtain habeas

review only if he is able to show either just cause for the default and resulting prejudice or that "failure to consider the claim [] will result in a fundamental miscarriage of justice."[8] Coleman v. Thompson, 501 U.S. 722, 749-50 (1991). Ineffective assistance of counsel can suffice as cause for a procedural default. "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray, 477 U.S. at 488-89); accord DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004). In order to make out an ineffective assistance of counsel claim, the petitioner must demonstrate that (1) his counsel's performance was deficient, and (2) the deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); accord Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). In assessing whether an attorney's performance was deficient, a reviewing court must determine whether his conduct "fell below an objective standard of reasonableness" given the facts and circumstances of the particular case. Strickland, 466 U.S. at 688. The court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[8] The latter exception is limited to those "extraordinary case[s][] where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496 (1986).

assistance." Id. at 689.  The "prejudice" prong of the Strickland test requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," id. at 687, and that but for the claimed errors of counsel, the trial result would have been different.  Id. at 694.

Mr. Ramos contends that his trial counsel was ineffective for failing to object to the prosecutor's remarks and that this ineffectiveness is just cause for the procedural default. The argument fails because, as the Appellate Division found, the prosecutor's comments in her summation were not improper.  It is undisputed that no witness testified that the object seen on the videotape resembled the gun used during the robbery.  However, a prosecutor "is entitled to comment upon evidence presented at trial and to urge the jury to draw reasonable inferences from that evidence." Moore v. Greiner, No. 02 Civ. 6122, 2005 WL 2665667, at *15 (S.D.N.Y. Oct. 19, 2005) (citing People v. Bailey, 58 N.Y.2d 272, 277, 460 N.Y.S.2d 912, 915 (1983)).  Moreover, "the prosecution has 'broad latitude in the inferences it may reasonably suggest to the jury during summations.'" Pineda v. Miller, No. 03 Civ. 1344, 2006 WL 2239105, at *19 (E.D.N.Y. Aug. 4, 2006) (quoting United States v. Zackson, 12 F.3d 1178, 1183 (2d Cir. 1993)). Here, the prosecutor merely asked the jurors to draw an inference from their own observations of the videotape, which had been admitted in evidence, when she said, "I submit to you right there

is the gun that was used. . . .  I ask you to continue to look at it and form your opinions as to what it is."  (2nd Tr. at 110). The prosecutor did not herself testify that the object on the videotape was the gun used in the robbery.  Any objection by defense counsel to the prosecutor's comments would therefore almost certainly have been futile, and his failure to object cannot be considered deficient performance.

Accordingly, Mr. Ramos's ineffective assistance of trial counsel claim lacks merit and cannot serve as cause for the procedural default.

### 2. Brady Violation

Mr. Ramos has expanded upon his prosecutorial misconduct claim by alleging that the prosecutor's "testimony" during summation was Brady material that should have been disclosed to defense counsel. (Pet. Reply at 6-a).  He argues that "defense counsel was entitled to advance[] notice . . . that the prosecutor was going to interject un-sworn testimony" regarding the object seen on the videotape.  (Pet. Reply. at 6-a).  This claim is unexhausted, since it was never raised in state court.

> It is well-settled that all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. . . . The exhaustion doctrine is satisfied if the claim has been fairly presented to the state courts.  A claim has been fairly presented if the state courts are apprised of both the factual and the legal premises of the claim the petitioner asserts in federal court.

Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (internal

13

quotation marks, citations, and alterations omitted).

The AEDPA provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); see also Greiner v. Wells, 417 F.3d 305, 317 n.14 (2d Cir. 2005). In this case, Mr. Ramos' Brady claim should be dismissed on the merits because it is clearly frivolous. See Terrence v. Senkowski, No. 97 Civ. 3242, 1999 WL 301690, at *5 n.4 (S.D.N.Y. May 12, 1999) (dismissing frivolous claim on merits before reaching question of procedural bar); Youngblood v. Greiner, No. 97 Civ. 3289, 1998 WL 720681, at *6 (S.D.N.Y. Oct. 13, 1998) (courts may dismiss unexhausted claims on the merits, particularly where claims are frivolous); Hogan v. Ward, 998 F. Supp. 290, 293 (W.D.N.Y. 1998) (same). The Second Circuit has summarized the prosecution's duty under Brady as follows: "to the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." DiSimone v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006) (citation, quotation marks, and alterations omitted). A Brady violation requires that "[t]he evidence at issue [] be favorable to the accused, either because it is exculpatory, or because it is impeaching." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Here, the petitioner

14

objects to the prosecutor's statements regarding the object seen on the videotape.   These remarks do not constitute "material evidence."   Furthermore, they were not exculpatory; nor would they have provided the defense with a means to impeach any prosecution witnesses.   Accordingly, the prosecutor did not breach her duties under Brady, and this claim should be rejected.

   B. Admission of 911 Call

      1. Procedural Bar

   The petitioner contends that the trial court erred when it admitted the tape of Ms. Djata's 911 call under the excited utterance exception to the hearsay rule.   According to Mr. Ramos, admission of the call deprived him of his due process right to a fair trial.[9]   The Appellate Division found that this claim was unpreserved and declined to review it in the interest of justice. Ramos, 12 A.D.3d at 317, 786 N.Y.S.2d at 425.   The court also stated, "[w]ere we to review this claim, we would reject it for the reasons stated in our decision on the co-defendant's appeal."   Id. at 317, 786 N.Y.S.2d at 425 (citation omitted).   In that decision, the Appellate Division upheld the trial court's ruling that the

---

      [9] The petitioner does not appear to raise a Sixth Amendment Confrontation Clause claim under Crawford v. Washington, 541 U.S. 36 (2004).   In any event, any such claim would fail because the declarant, Ms. Djata, testified at trial and was subject to cross-examination.   See Crawford, 541 U.S. at 59 n.9 ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").

call was an excited utterance, finding that Ms. Djata "made the 911 call immediately after the crime while still under the stress and excitement resulting from the incident." Veeraswamy, 11 A.D.3d at 345, 784 N.Y.S.2d at 488.

When the 911 tape was introduced, Ms. Veeraswamy's attorney objected on the ground that the call did not qualify as an excited utterance.  (1st Tr. at 275-76).  Mr. Ramos's attorney told the court that his objection focused on "that conversation [between Ms. Djata and Ms. Burgos] that took place while [Ms. Djata] was put on hold."  (1st Tr. at 276).  The court ruled that Ms. Djata's statements to the 911 operator, as well as her statements to Ms. Burgos, qualified as excited utterances. (1st Tr. at 288-90).  The court then stated, "[Counsel clearly have an exception to my ruling."  (Tr. at 291).

The contemporaneous objection rule requires a defendant to register an objection to a trial court ruling "at the time of such ruling . . . or at any subsequent time when the court had an opportunity of effectively changing the same" in order to preserve the issue for appeal.  CPL § 470.05(2).  New York courts have consistently found that a defendant cannot rely upon a co-defendant's objection, but must himself register a protest.  See People v. Buckley, 75 N.Y.2d 843, 846, 552 N.Y.S.2d 912, 914 (1990); People v. Sennon, 170 A.D.2d 546, 546, 566 N.Y.S.2d 327, 328 (2d Dep't 1991); People v. McKenna, 151 A.D.2d 510, 510, 543

N.Y.S.2d 320, 320 (2d Dep't 1989), rev'd on other grounds, 176 N.Y.2d 59, 556 N.Y.S.2d 514 (1990); People v. Foster, 100 A.D.2d 200, 207, 473 N.Y.S.2d 978, 983-84 (2d Dep't 1984), rev'd in part on other grounds, 64 N.Y.2d 1144, 490 N.Y.S.2d 726 (1985). Furthermore, that protest must be specific to the error alleged on appeal.   See People v. Gray, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 175 (1995).

The Appellate Division apparently concluded that Mr. Ramos, by asserting an objection that was apparently limited to that portion of the tape containing the conversation between Ms. Djata and Ms. Burgos, did not preserve any argument with respect to the remainder of the call, despite the fact that Ms. Veeraswamy raised a broader objection.   Accordingly, the Appellate Division found that Mr. Ramos's claim was procedurally barred.   As noted above, the general rule is that a defendant must himself raise an objection that is specific to the error alleged on appeal.   However, the trial court clearly indicated that it found that both counsel had objected to the ruling that the tape was admissible under the excited utterance exception.   (Tr. at 290-91).   Under such circumstances, it is inappropriate to find the claim unpreserved with respect to one defendant and preserved with respect to the other.

2. Merits

Nevertheless, the petitioner's claim must be rejected on its merits.   "'Federal habeas corpus relief does not lie for errors of

state law.'" Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffery, 497 U.S. 764, 780 (1990)).  "'Issues regarding the admissibility of evidence in state court concern matters of state law and are not subject to federal review unless the alleged errors are so prejudicial as to constitute fundamental unfairness.'" Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000) (quoting McCray v. Artuz, No. 93 Civ. 5757, 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994)).  Accordingly, a petitioner challenging a state court's evidentiary ruling must demonstrate that (1) the ruling was  erroneous as a matter of state law and (2) the error denied him the constitutional right to a fair trial.[10] Williams v. Walker, No. 00-CV-5912, 2001 WL 1352105, at *3 (E.D.N.Y. Oct. 31, 2001); see also Till v. Miller, No. 96 Civ. 4387, 1998 WL 397848, at *4 (S.D.N.Y. July 16, 1998) ("The petitioner has not demonstrated that the trial court misapplied state evidentiary standards, much less committed a constitutional error that resulted in actual prejudice.").

> "[T]o determine whether a constitutional violation has occurred through the erroneous admission of evidence, the petitioner must show that the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record

---

[10] This analysis applies where, as here, the petitioner has not attacked the constitutionality of the state evidentiary rule itself.  See Roman v. Filion, No. 04 Civ. 8022, 2005 WL 1383167, at *26 n.45 (S.D.N.Y. June 10, 2005) (citing Jones v. Stinson, 94 F. Supp. 2d 370, 387 n.19 (E.D.N.Y. 2000)).

without it.   In short it must have been crucial,
critical, highly significant."

Roldan, 78 F. Supp. 2d at 276 (S.D.N.Y. 2000) (quoting Schurman v.
Leonardo, 768 F. Supp. 993, 1001 (S.D.N.Y. 1991) (internal
quotations omitted)).

As noted above, the trial court admitted Ms. Djata's 911 call
under the excited utterance exception to the hearsay rule.
"'Excited utterances' are the product of the declarant's exposure
to a startling or upsetting event that is sufficiently powerful to
render the observer's normal reflective processes inoperative."
People v. Vasquez, 88 N.Y.2d 561, 574, 647 N.Y.S.2d 697, 703 (1996)
(citation omitted).   In other words, "'[a]n excited utterance
occurs under the immediate and uncontrolled domination of the
senses, and during the brief period when considerations of self-
interest could not have been brought fully to bear by reasoned
reflection' -- a period which 'is not measured in minutes or
seconds but rather is measured by facts.'"  Mungo v. Duncan, 393
F.3d 327, 331 (2d Cir. 2004) (quoting People v. Cotto, 92 N.Y.2d
68, 78-79, 677 N.Y.S.2d 35, 40 (1998)).   Such statements are
admissible if the "surrounding circumstances reasonably justify the
conclusion that the remarks were not made under the impetus of
studied reflection."  People v. Brown, 70 N.Y.2d 513, 519, 522
N.Y.S.2d 837, 840 (1987) (emphasis omitted); accord People v.
Edwards, 47 N.Y.2d 493, 497, 419 N.Y.S.2d 45, 47 (1979).

Ms. Djata testified that she called 911 "immediately" after

19

Mr. Ramos and Ms. Veeraswamy left her apartment.  (1st Tr. at 284).
She also testified that she did not discuss the incident with
anyone in the apartment before she made the call.  (1st Tr. at
284).  The trial court found that Ms. Djata's statements during the
call supported her testimony, observing that at one point she said,
"[L]et me see if he's still outside," which showed that the call
was made "shortly after the alleged perpetrators had fled."  (1st
Tr. at 287).  The court noted that during the call Ms. Djata asked
Ms. Burgos to retrieve her files, indicating that it had not
previously occurred to her that she had the defendants'
biographical information and photographs.  (1st Tr. at 288-89).
The court also determined that it was clear from the recording that
Ms. Djata was in an excited state when she made the call.  (1st Tr.
at 289).  Finally, the court found that the fact that some of Ms.
Djata's statements were made in response to questioning by the 911
operator did not remove them from the scope of the exception.  (1st
Tr. at 289-90).  Accordingly, the court concluded that the entire
call, including the statements made to Ms. Burgos, fell within the
excited utterance exception.

The petitioner contends that the circumstances surrounding the
call did not justify its admission.  According to Mr. Ramos, Ms.
Djata was put on hold "a number of times" during the call, which
gave her "the opportunity to reflect upon what she was saying."
(Pet. App. Brief at 32).  He also claims that the operator's

questioning was "lengthy." (Pet. App. Brief at 32). Finally, the petitioner claims that Ms. Djata sounds "composed" on the recording. (Pet. App. Brief at 32-33).

As the trial court emphasized, Ms. Djata made the 911 call immediately after Mr. Ramos and Ms. Veeraswamy left her apartment. The fact that some time elapsed while Ms. Djata was on hold does not bar a finding that the call was admissible, and there is no indication in the record that the pauses in the conversation were so lengthy as to permit "studied reflection." Brown, 70 N.Y.2d at 519, 522 N.Y.S.2d at 840. Furthermore, the fact that some of her statements were elicited by the 911 operator's questioning does not render the call inadmissible. See People v. Johnson, 1 N.Y.3d 302, 306-07, 772 N.Y.S.2d 238, 242 (2003) (fact that statements made in response to police questioning, "standing alone," does not defeat admissibility); Cotto, 92 N.Y.2d at 79, 677 N.Y.S.2d at 41 (same); People v. Fratello, 92 N.Y.2d 565, 570-71, 684 N.Y.S.2d 149, 151 (1998) (same). In any case, the trial court specifically noted that "very little of [the call] was questioning by the 911 operator." (1st Tr. at 289). Finally, although Mr. Ramos claims that Ms. Djata was "composed" when she made the call, the trial court plainly found otherwise, and this Court cannot disturb the trial court's findings of fact.

Furthermore, the New York Court of Appeals has "cited the declarant's presence on the witness stand as additional

21

justification for the allowance [of statements that fall within a hearsay exception] because of the opportunity to verify and test the statements' trustworthiness." People v. Buie, 86 N.Y.2d 501, 512, 634 N.Y.S.2d 415, 421 (1995); see also People v. Caviness, 38 N.Y.2d 227, 232, 379 N.Y.S.2d 695, 700 (1975) ("[A]lthough not essential for admissibility, there was an added assurance of reliability since the proof of the declaration was by the declarant who, in taking the stand, was subject to cross-examination."). Here, Ms. Djata testified at trial and was subject to cross-examination. Accordingly, the Appellate Division's decision was not erroneous as a matter of state law, and Mr. Ramos is not entitled to habeas relief on this claim.

C. Excessive Sentence

Mr. Ramos claims that his sentence, as modified by the Appellate Division, was unduly harsh and excessive under the circumstances. Mr. Ramos was initially sentenced to twelve years in prison followed by five years of supervised release. On appeal, the Appellate Division reduced his sentence "as a matter of discretion in the interest of justice" to a term of ten years. Ramos, 12 A.D.3d at 316, 786 N.Y.S.2d at 424. When he applied to the Court of Appeals for a certificate granting leave to appeal the Appellate Division's decision, the petitioner specifically stated that he did not seek leave to appeal the modification of his sentence. (Letter of Steven J. Miraglia dated Nov. 30, 2004,

22

attached as Exh. 4 to Maisonet Aff., at 2).  Accordingly, this claim is not exhausted.[11]

As noted above, this Court has discretion to deny an unexhausted claim on the merits.  To the extent that Mr. Ramos challenges his sentence on the ground that it is "unduly harsh" and "excessive under the circumstances," it is not cognizable in a habeas corpus proceeding.  As explained above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67-68.  A violation of state law is not a cognizable habeas claim unless it implicates a constitutional concern.  Id. at 67; Noble v. Kelly, 246 F.3d 93, 98 (2d Cir. 2001).  "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992)).  As a second felony offender, Mr. Ramos could have been sentenced to anywhere from eight to twenty-five years in prison. See N.Y. Penal Law §§ 70.06(6)(a), 70.02(1)(a).  Therefore, his ten year sentence does not raise a constitutional issue.

Mr. Ramos further contends that his sentence contravenes Booker.  This claim should also be denied on the merits.  In

_____

[11] The claim also appears to be procedurally defaulted because petitioner's time to appeal the Appellate Division's decision has expired.  See CPL § 460.10(5) (application for leave to appeal to Court of Appeals must be made within thirty days of service of order of Appellate Division).  Accordingly, he no longer has any means to raise the claim in state court.

Booker, the Court affirmed its holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."[12]  Booker, 543 U.S. at 244.  Mr. Ramos was sentenced pursuant to N.Y. Penal Law § 70.06(6)(a), which requires a court to impose a sentence of between eight and twenty-five years if it finds that the defendant is a second felony offender and that the sentence to be imposed is for a Class B violent felony offense. Mr. Ramos appears to contend that his sentence is unconstitutional because the sentencing judge, rather than the jury, determined that he had previously been convicted of a felony and therefore qualified as a second felony offender.  Mr. Ramos's claim must fail because the determination that he had committed a predicate felony "clearly falls within Apprendi's 'fact of a prior conviction' exception." Brown v. Greiner, 409 F.3d 523, 534 (2d Cir. 2005) (applying AEDPA standard and holding that a

---

[12] The Court in Booker held that the previously-announced rule that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" also applied to the Federal Sentencing Guidelines.  543 U.S. at 232, 243-44 (emphasis omitted).  The Court found that the mandatory Guidelines violated the Sixth Amendment because they required judges to impose sentences greater than the statutory maximum based upon facts found by the judge, rather than by the jury.  Id. at 233-34.

state court's determination that New York's persistent felony offender statute, N.Y. Penal Law § 70.10, was constitutional was not unreasonable interpretation of <u>Apprendi</u>); <u>cf.</u> <u>Cruz v. Filion</u>, 456 F. Supp. 2d 474, 482-83 (S.D.N.Y. 2006) (finding New York's persistent violent felony offender statute, N.Y. Penal Law § 70.08, constitutional under <u>Apprendi</u>); <u>James v. Artus</u>, No. 03 Civ. 7612, 2005 WL 859245, at *16 (S.D.N.Y. April 15, 2005) (same); <u>McKenzie v. Poole</u>, No. 03 Civ. 4253, 2004 WL 2671630, at *9-10 (E.D.N.Y. Nov. 23, 2004) (same). Accordingly, Mr. Ramos's claim is meritless and should be denied.

D. <u>Sufficiency of the Evidence</u>

Finally, Mr. Ramos contends that the evidence presented at trial did not support a conviction for first degree robbery. The standard for habeas corpus review of such claims is well settled. There is a "very heavy burden placed upon a defendant challenging the sufficiency of the evidence underlying his conviction." <u>Knapp v. Leonardo</u>, 46 F.3d 170, 178 (2d Cir. 1995) (internal quotations omitted). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999) (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993)). The Court must "decide whether the record is 'so totally devoid of evidentiary support that a due process

issue is raised.'"  <u>Bossett v. Walker</u>, 41 F.3d 825, 830 (2d Cir. 1994) (quoting <u>Mapp v. Warden, New York State Correctional Institute for Women</u>, 531 F.2d 1167, 1173 n.8 (2d Cir. 1976)).

A federal court reviewing a sufficiency of evidence claim does not make an independent determination as to whether the evidence demonstrates guilt beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979).  Rather, the habeas court "stands in the shoes of the state trial court." <u>Mallette v. Scully</u>, 752 F.2d 26, 31 (2d Cir. 1984).  In so doing, it must construe the evidence in the light most favorable to the prosecution, and defer to the jury's resolution of any conflicts in the testimony and to its assessment of the credibility of witnesses. <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Herrera</u>, 506 U.S. at 401-02 (noting that court should ask only whether decision to convict was rational, not whether it was correct).  "[A]s long as any competent evidence went to the fact-finders from which they could infer guilt beyond a reasonable doubt, the conviction will stand." <u>Martin v. Scully</u>, 748 F. Supp. 159, 164 (S.D.N.Y. 1990) (quoting <u>McShall v. Henderson</u>, 526 F. Supp. 158, 161 (S.D.N.Y. 1981)).

In making this determination, of course, the Court "must look to state law to determine the elements of the crime." <u>Quartararo</u>, 186 F.3d at 97 (citation omitted).  Under New York Penal Law § 160.15, a person is guilty of first degree robbery when he (1) forcibly steals property and (2) in the course of the commission of

26

the crime, displays a firearm or what appears to be a firearm.  In order to be guilty of robbery, a person must act with the intent to deprive another permanently of his or her property.  See N.Y. Penal Law §§ 155.00, 155.05.

The petitioner argues that the evidence did not support a conviction because "the version of events related by the People's witnesses [was] so inherently implausible and bizarre as to be unreliable." (Pet. App. Brief at 24-27).  However, the version of events related by Ms. Djata and Ms. Burgos was scarcely less plausible than the version related by Ms. Veeraswamy, and the jury appears to have found it the more credible of the two.[13]  The petitioner's assertion that it is unreasonable to believe that Mr. Ramos committed the crime because he knew that Ms. Djata could identify him to the police is not compelling.  (Pet. App. Brief at 26-27).  Although it may well have been "beyond folly for the pair to have violently attacked [Ms.] Djata, a person they knew well, then left their videotaped calling card at her door" (Pet. App. Brief at 27), the jury nevertheless could reasonably have found that they did so; it is not unusual for criminals to act foolishly.

Mr. Ramos next claims that, even crediting the testimony of

---

[13] This is unsurprising.  Ms. Burgos and Ms. Djata had apparently gone their "separate ways" by the time of the trial (1st Tr. at 356), and Ms. Burgos therefore had little reason not to tell the truth.  By contrast, Ms. Veeraswamy's trial testimony was inconsistent with an earlier written statement made immediately after her arrest.  (2nd Tr. at 30-35).

Ms. Burgos and Ms. Djata, it would be unreasonable to find that he intended to deprive Ms. Djata of her video camera permanently. (Pet. App. Brief at 27-29). He notes that Ms. Djata testified that Mr. Ramos called her on the night of the incident and explained that he and Ms. Veeraswamy did not want to keep the camera. (Pet. App. Brief at 28). Moreover, they returned the camera several days later. (Pet. App. Brief at 28-29). However, the fact that the stolen property was later returned does not bar a finding that at the time that he and Ms. Veeraswamy took the camera, Mr. Ramos intended to keep it. See People v. Smith, 140 A.D.2d 259, 261, 528 N.Y.S.2d 562, 564 (1st Dep't 1988) ("Whether the subsequent return of [the property] negates a finding of intent 'to deprive' or 'to appropriate' the property is a question of fact for the [] jury.").

Accordingly, the evidence presented at trial supports the petitioner's conviction, and this claim should be rejected.

Conclusion

For the reasons set forth above, I recommend that Mr. Ramos's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 630, and to the chambers of the

undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           May 8, 2007

Copies mailed this date to:

William Ramos
02-A-5419
Barehill Correctional Facility
Caller Box 20
181 Brand Road
Malone, New York 12953

Karen Swiger, Esq.
Dimitri Maisonet, Esq.
Assistant District Attorneys
198 East 161st Street
Bronx, New York 10451